Theron D. Stay and Florence Stay (Husband and Wife) v. Commissioner.
Stay v. Commissioner
Docket Nos. 65355, 66609.
United States Tax Court
T.C. Memo 1958-173; 1958 Tax Ct. Memo LEXIS 51; 17 T.C.M. (CCH) 861; T.C.M. (RIA) 58173; September 19, 1958
*51 Petitioners had annual income from husband's salary and other sources in excess of $20,000. During the years 1951 to 1955, inclusive, they sustained losses in farming operations. Held, the losses were incurred in the operation of a business and properly deductible under the provisions of section 23(e), I.R.C. of 1939, and section 165(c), I.R.C. of 1954. Douglas S. Meaden, *52 C.P.A., 1321 Citizens Building, Cleveland, Ohio, for the petitioners. L. Robert Leisner, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioners' income tax for the years 1951 through 1955, as follows: Year
Deficiency
1951
$1,729.27
1952
2,923.97
1953
3,252.00
1954
2,285.80
1955
2,539.73
The issue is whether losses sustained by petitioners in farming operations during the years in question are deductible under section 23(e) of the Internal Revenue Code of 1939 and section 165(c) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts were stipulated and are found accordingly. Petitioners are husband and wife who reside in Cleveland Heights, Ohio. They filed their joint income tax return for each of the years involved with the then collector and/or district director of internal revenue at Cleveland, Ohio. Thereon D. Stay is a metallurgical engineer and during the years involved was employed by the Reynolds Metals Company at a salary of $19,200 a year. In addition, he was paid approximately $2,000 per *53 year in consultant fees and he had an income of less than $1,000 each year from dividends. His duties required his traveling at least five days a week. Petitioners were married in 1917 and they have four children. In 1927 when petitioners' children were under school age, Florence bought a farm consisting of about 85 acres and located near the town of Novelty, Ohio, some 14 or 15 miles from their home in Cleveland Heights. Florence paid $14,000 for the farm in the form of $7,500 cash and a $6,500 mortgage. There was a 2-story farm house and a small tenant cottage on the farm and a barn, sheds, poultry house and the usual farm buildings. The fences and all of the buildings were in a dilapidated state. The roof was off of the barn and the foundation under the house was in poor condition. After purchasing the farm, every member of the family worked on the farm at all available times. The children began to spend week ends and summers working on the farm and Florence spent on the average of three or four days a week at the farm doing chores and driving a tractor and engaging in other farm work. Petitioners did not live on the farm but they hired a farmer who lived in the tenant's cottage. *54 Petitioners raised hay, grain, fruits and vegetables on the farm and sold some of the produce, but they fed most of the hay and grain to dairy cattle and sold the milk. They also raised chickens and sold poultry and eggs, and they raised and sold some swine. Petitioners spent a considerable amount of money in conservation practice and in building up the land and made substantial purchases of equipment and machinery and they spent considerable sums restoring and repairing the farm buildings and fences. A stipulated summary of figures taken from petitioners' income tax returns for the years 1946 to 1955, inclusive, shows that in the farm operation petitioners had sales of cattle, swine, vegetables, fruit, dairy products, eggs and poultry in every year, and small sales of grain and hay in five of the years. The summary shows the items of cost and expenditures such as labor, seed, machinery hire, repairs and maintenance, breeding fees, veterinary, insurance, farm auto expense, taxes, electricity, telephone, etc. The summary also shows the depreciation taken by petitioners in each of the years. The totals of gross revenues, cost expenditures, depreciation, and resulting losses are shown *55 on the summary to be as follows: Gross
Cost Ex-
Depre-
Farm
Year
Revenues
penditures
ciation
Loss
1946
$2,696.17
$5,289.50
$ 968.96
$3,562.29
1947
3,091.30
5,848.30
1,241.30
3,998.30
1948
3,917.79
7,031.11
1,392.37
4,505.69
1949
3,377.70
7,227.60
2,266.69
6,116.59
1950
3,776.33
8,161.17
2,389.34
6,774.18
1951
5,300.46
7,820.97
2,901.07
5,421.58
1952
4,890.28
9,286.43
3,838.97
8,235.12
1953
4,449.98
9,897.79
3,970.69
9,418.50
1954
5,146.47
8,968.91
3,915.44
7,737.88
1955
5,965.15
8,374.69
3,877.92
6,287.46
The farm was not operated by petitioners as a hobby and not used by petitioners as a place for entertainment. The farm was operated by petitioners during the years involved for profit and its operation constituted a business regularly carried on for profit during said years. Opinion This case concerns the allowability of losses sustained by petitioners in the operation of a farm during the years 1951 through 1955. The question is whether the losses were "incurred in a trade or business" within the provisions of section 23(e)(1) of the Internal Revenue Code of 1939 and section 165(c)(1) of the Internal Revenue Code *56 of 1954. Respondent does not exactly argue that the farm was operated by petitioners as a "hobby" but his argument is that the evidence of considerable and continuous losses in the farm operation establishes the fact that petitioners had no intent to make a profit from such operation and therefore the farm operation was not a "business" within the provisions of the statute. The record indicates that the farm operation never had yielded a profit to petitioners, when all available deductions, including allowable deductions for depreciation were considered, and the stipulated tax return summaries show that petitioners had taken losses from the farm operation for each of the 10 years from 1946 to 1955, inclusive. In Norton L. Smith, 9 T.C. 1150, at p. 1155, we said: "The fact that the operation of the farm has resulted in a series of losses, however, is not controlling if the other evidence shows there is a true intention of eventually making a profit." Here all of the other evidence indicates that petitioners had a true intention of making a profit. The farm, which consisted of between 85 and 100 acres, is located near Novelty, Ohio, about a half hour drive from petitioners' *57 home in Cleveland. At the time of purchase, the farm was run down and there was no equipment or stock on it and the fences and buildings were in a dilapidated condition. Thereafter farming operations in the usual sense were carried on by petitioners almost entirely under the supervision of Florence Stay. During some of the years petitioners rented and farmed an adjoining 15 acres. Petitioners did not live on the farm but they hired a farmer who did, and petitioners and also their children in the early years when the children were home spent much time working on the farm on week ends and holidays. Florence Stay drove out to the farm about three or four days a week. She helped with the work of the farm, driving a tractor or hay baler and doing chores. The buildings were restored, the farm electrified, a water system established, and fences repaired. Petitioners raised some swine but the farm operation was essentially a dairy farm and in the later years a poultry operation was added, for both eggs and meat. Usually the farm raised its requirement of hay and some years petitioner sold hay. The poultry business was built up to where, at the time of trial, it was yielding about three cases *58 of eggs a week (from about 250 cheikens) which were sold to a retail merchant in Cleveland. The milk from some 17 cows was sold to a retail milk distributor in Cleveland. The evidence shows that over the years the poultry business suffered losses from the death of chickens, and in the dairy operation two herds of cattle were lost by disease and one herd was disposed of when the farm employee took sick. Petitioners sought the aid of the Soil Conservation District and the Department made a survey of the farm and gave petitioners a written plan of operation, which is in evidence. It is a layout of the farm with markings for its various uses for best advantage. Petitioners followed this plan and put a considerable amount of money into conservation practices and building up the land. They contoured the fields and dammed up the water to prevent run-off, and planted evergreens for reforestation in the wasteland. Petitioners bought thousands of dollars worth of machinery and equipment but according to neighbors, it was all needed. Petitioners never used the farm as a place of entertainment and it was in no sense a "show place." It had the usual complement of buildings, consisting of barn, *59 sheds, poultry house, and there was a small tenant house and a larger dwelling house. There are two pictures of the farm in evidence and they show the larger house is an ordinary 2-story farm home. Petitioners' son, a graduate mechanical engineer and an employee of the Lincoln Electric Company in Cleveland, lives on the farm with his family in the larger house which he rents from petitioners for $100 a month. He still helps with the farm work on week ends and takes care of the machinery and he spends his 2-week summer vacation working on the farm. Respondent admits that this record establishes that petitioners are thrifty, frugal people who, with the other members of the family, did much hard work on the farm. We feel it also establishes a profit motive in such operation in spite of the long record of losses. Florence Stay testified: "I haven't tried to make a lot of money, but I have tried to build up a farm as a piece of security." Respondent fastens on this testimony as showing the profit motive in the farm operation was lacking, and the expenditures from the husband's salary to make up the farm losses were some sort of capital investment for security in the event of a depression *60 or for petitioners' old age, and not business losses. There is no merit in this argument. The idea that a farm is kept and operated year after year at a loss, with the hope that it would produce a living in the event of a depression, or security for old age, is not inconsistent with an intent to make a present profit, if possible. Dean Babbitt, 23 T.C. 850. Respondent's counsel stated at the trial that there was no issue as to the amount of the farm losses petitioners took during the years in question and he did not question the figures or computation on the schedules and returns that showed the farm losses for income tax purposes. We hold the losses were deductible under the provisions of section 23(e) of the Internal Revenue Code of 1939 and section 165(c) of the Internal Revenue Code of 1954. Because of an adjustment which is not contested, Decisions will be entered under Rule 50.